STATE of Wisconsin, Plaintiff-Respondent,†

v.

Anthony T. HICKS, Defendant-Appellant.

Court of Appeals

*No. 94–2256–CR. Submitted on briefs June 13, 1995.—Decided June 29, 1995.*

(Also reported in 536 N.W.2d 487.)

†Petition to review granted.

For the defendant-appellant the cause was submitted on the briefs of *Stephen P. Hurley* and *John D. Hyland* of *Hurley, Burish & Milliken, S.C.* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Gartzke, P.J., Dykman and Vergeront, JJ.

VERGERONT, J.   Anthony Hicks appeals from a judgment convicting him of one count of burglary contrary to § 943.10(1)(a), STATS., one count of robbery contrary to § 943.32(1)(a), STATS., and two counts of second-degree sexual assault contrary to § 940.225(2)(a), STATS., and from an order denying his motion for a new trial. He challenges the convictions on a number of grounds, but we decide only one. We conclude Hicks's trial counsel was ineffective and we

therefore reverse the judgment and the order and remand for a new trial.

## BACKGROUND

The convictions are the result of charges that on the morning of November 15, 1990, Hicks gained entry to the apartment of Diane F. with intent to commit a felony, and that once inside the apartment he forced her into two separate acts of sexual intercourse and robbed her of $10.

At trial, Diane F. testified that she heard a knock on her apartment door, looked through the peephole for approximately ten seconds, and saw a black man who told her that he was her upstairs neighbor. The man asked to use her telephone because his was broken. Diane F. let the man into her apartment and led him to the phone. While she was in the bathroom getting ready for work, she saw the man's face behind her in the mirror. He threw a scarf around her head and neck, blinding her with both the scarf and her hair. During the assault that followed, she caught glimpses of his face and he spoke to her intermittently. According to Diane F., the assailant was in her apartment between 7:25 a.m. and 7:55 a.m. Diane F. picked out Hicks as her assailant from an eight-man lineup conducted two days after the assault.

It was stipulated that Hicks was living in the same apartment complex as Diane F. and the two apartments were ninety seconds away by walking.

The State presented testimony from a state crime lab analyst that, based on a microscopic examination, a Negro head hair found on the comforter of Diane F.'s bed and four Negro pubic hairs found when the police conducted a vacuum sweeping of the apartment approximately fifteen days after the assault were "con-

sistent" with the samples provided by Hicks. The analyst also testified that a Caucasian head hair was found inside the pants Hicks was wearing when he was taken into custody forty-eight hours after the assault. These pants were not the sweat pants Diane F. testified were worn by her assailant. The Caucasian head hair was found when the pants were examined a few weeks later. The crime lab analyst testified that, based on a microscopic examination, the Caucasian head hair was "consistent" with a sample provided by Diane F.

The crime lab analyst explained that all Negro hair shares the same characteristics and all Caucasian hair shares the same characteristics, although not all Negro hair is identical and not all Caucasian hair is identical. She also testified that a microscopic comparison of hair, unlike fingerprints, can never yield a definitive identification. She stated that to a reasonable degree of scientific certainty, the unknown Negro and Caucasian hair specimens "could have" come from Hicks and Diane F. respectively. Other than the microscopic comparisons, the State performed no other tests on the hair samples.

The State performed serological testing on specimens of semen, blood and saliva obtained at the crime scene. These results were inconclusive. Pursuant to the motion of Hicks's trial counsel, the semen was sent to a laboratory outside the state for DNA analysis. These results were inconclusive.

Diane F. testified that no black male had ever been in her apartment before the assault and that only once, almost two years before the assault, was a black female in her apartment. This woman wanted to borrow a blanket.

A defense witness, Savannah Williams, testified that she was living with Hicks at the time of the

assault. On that morning, Hicks left their apartment at about 6:40 a.m. to meet his ride for work. He had been complaining that he was not feeling well. According to Williams, Hicks returned after about twenty minutes saying he was not going to work that morning. She was with him, she testified, until about 7:00 a.m., when she left for Rockford, Illinois. She identified a call on the telephone bill made to her mother's house in Rockford at 8:12 a.m., which she said was made by Hicks, reaching her just after she arrived at her mother's.

Hicks's employer testified that Hicks called his place of employment sometime between 7:00 a.m. and 7:30 a.m. that morning to say he would not be in.

After Hicks's conviction and sentencing, Hicks had a DNA analysis performed at Cellmark Diagnostics in Germantown, Maryland, on the unknown hair specimens. He then moved for a new trial contending, among other claims, that his trial counsel had been ineffective in not having DNA testing done on the hair specimens.

At the evidentiary hearing on the motion, Dr. Charlotte Word of Cellmark testified that the unknown Caucasian head hair, the unknown Negro head hair, and two of the unknown Negro pubic hair specimens did not yield DNA sufficient for analysis. Specimens 012 and 013 were the two pubic hair specimens for which enough DNA was obtained. Word testified that specimen 012 revealed the presence of DNA from two sources. This usually indicates, Word said, presence of a second source of DNA on the hair itself, such as blood, semen or saliva. Because of the two sources of DNA, the results as to this specimen were inconclusive. Hicks was excluded as the source of the main amount of DNA on specimen 012, but Word could not come to a conclusion as to the fainter source of DNA on specimen 012.

As for specimen 013, the DNA from this sample was compared to the DNA extracted from Hicks's blood sample. Word testified that Hicks was excluded as the source of the DNA from this specimen. Word testified that, in her opinion to a reasonable degree of scientific certainty, Hicks was not the donor of hair specimen 013. Word acknowledged that this opinion was based on the assumption that the DNA on specimen 013 was from a single source. She could not prove the DNA was from a single source, but that was the most reasonable conclusion based on several factors, and there was no information to suggest it was not from a single source.

The trial court denied Hicks's motion for a new trial. It concluded that there was no prejudice to Hicks as a result of his counsel's failure to obtain DNA test results for trial because it was not reasonably probable a new trial with the DNA testimony would result in a different verdict. The trial court based this conclusion on what it considered substantial evidence against Hicks, most importantly Diane F.'s identification of Hicks.

## DISCUSSION

■■■

The Sixth Amendment right to counsel is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). To prevail on his claim for denial of effective assistance of counsel, Hicks must show that his trial counsel's performance was deficient and that this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The performance inquiry determines whether counsel's assistance was reasonable under prevailing professional norms and considering

all the circumstances. *Id.* at 688. A defendant must overcome the presumption that, under the circumstances, the challenged action of trial counsel might be considered sound trial strategy. *Id.* at 689.

Under the prejudice prong, the defendant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The trial court's determinations of what the attorney did and did not do, and the basis for the challenged conduct, are factual and will be upheld unless clearly erroneous. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990). The ultimate determinations of whether counsel's performance was deficient and prejudicial to the defense are questions of law that this court reviews independently. *Id.* at 128, 449 N.W.2d at 848.

The trial court did not determine whether Hicks's trial counsel's performance was deficient and it made no factual findings on this issue. However, Hicks's trial counsel's testimony at the postconviction hearing was not disputed. We therefore review his testimony in the context of the entire proceeding to determine whether, as a matter of law, his representation fell below an objective standard of reasonableness. *See State v. Marty*, 137 Wis. 2d 352, 357, 404 N.W.2d 120, 122 (Ct. App. 1987). We conclude that it did.

Hicks's trial counsel testified he was aware that the hair samples would be a major issue in the case. Before the trial, he knew that the root tissue of hair specimens could be subject to DNA testing at certain out-of-state laboratories and he knew of the technology

used for that testing. He did not discuss this with his client or with the district attorney, or petition the court to have this test performed or do anything to pursue such testing. Hicks had never told his counsel he had committed the offenses with which he was charged.

Hicks's trial counsel gave these reasons for not pursuing the DNA testing of the hair specimens:

> There was a strategic reason why the additional testing was not even discussed. In consultation with Mr. Hicks it was our belief, that 1, no test tube of physical evidence connected Mr. Hicks with this crime. 2, the testimony of Karen Dorfler [sic] consistent with what Mr. Bisbing had told me in September of 1991, that there was no way she could ever testify that — that those hair samplings came from Mr. Hicks, and in her cross-examined testimony, and even in consultations with Miss Dorfler [sic] at the State crime lab she could never state as a fact that any of those hair samples in fact came from Mr. Hicks. It was our belief that the serological analysis of the saliva, the blood, the semen, that there would not have been any correlation of any of that scientific testimony to Mr. Hicks. Further it was our strategy that under 904.06 — or 406 of the federal rules that the evidence regarding the hair samples was inadmissible as a matter of law. We sought an objection.[1] The Court allowed it in.

---

[1] The reference by Hicks's trial counsel to § 904.06, STATS., and FED. R. EVID. 406 appears to be an error. He moved for exclusion of the pubic hairs at trial on the ground they were collected fifteen days after the assault, citing § 904.03, STATS., as a basis for the motion. Section 904.03 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The motion to exclude the pubic hairs was denied.

In response to further questioning about his reasons, Hicks's trial counsel stated:

> One reason obviously would have been costs, one reason, and in 20-20 hindsight may have been just a failure to further explore these other technologies in hindsight.

Hicks's trial counsel then acknowledged that he did not explore the costs of the tests.

We are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. But even after applying that presumption, we must conclude that the decision not to subject the hair specimens to DNA analysis was unreasonable.

■

Hicks's trial counsel stated he had a "strategic reason" for not pursuing DNA testing on the pubic hair specimens. But this label does not insulate his decision-making from analysis. *See State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161, 169 (1983) (reviewing court does not ratify a lawyer's decision simply because it is labeled "trial strategy" by trial court). "Trial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have then relied." *Id.* at 503, 329 N.W.2d at 169. This standard "implies deliberateness, caution, and circumspection" and the decision "must evince reasonableness under the circumstances." *Id.* at 502, 329 N.W.2d at 169.

DNA testing on the pubic hair specimens is not inconsistent with the approach trial counsel testified he decided on: demonstrating the weakness of the state crime analyst's testimony on the microscopic examination of the hair specimens. We can see no reason that

he needed to elect one or the other. He did not testify to any disadvantage or difficulty in obtaining DNA test results on the pubic hair specimens and, based on the record, we see none. His belief that the pubic hair specimens should be excluded because they were collected fifteen days after the assault is not a reasonable basis for not pursuing DNA testing on them. Without a pretrial ruling excluding the hairs, trial counsel had no assurance the trial court would agree with him. A reasonable strategy choice would have taken into account the possibility that the trial court might admit the hairs over objection, as the court in fact did. The inconclusive results on the other physical material—the semen, saliva, and blood—also do not provide a reasonable explanation for not pursuing DNA testing on the pubic hair specimens.

■

The sole issue at trial was whether Hicks was the man that entered Diane F.'s apartment and assaulted her. Hicks's trial counsel understood that the hair samples were going to be a major issue in the case. But he has provided no reasoned basis for failing to pursue a testing process that he knew had the potential to provide exculpatory evidence on this major issue. We do not intend to suggest that failure to obtain DNA test results is always deficient performance. The *Strickland* analysis we use focuses on the circumstances of each case. We hold here only that, under the circumstances of this case, Hicks's trial counsel's decision not to pursue DNA analysis of the hair specimens was not "a strategic or tactical decision . . . based upon rationality founded on the facts and the law." *Felton*, 110 Wis. 2d at 502, 329 N.W.2d at 169.

Turning to the prejudice prong of the test, we conclude trial counsel's deficient performance did

prejudice Hicks. The State in its closing argument told the jury the three points it was relying on: positive identification, opportunity, and the physical evidence of the hair specimens. The crime analyst's conclusions regarding the hair specimens were repeated several times in closing argument. There is no question that that testimony was an important part of the State's case.

The trial court reasoned that since the DNA test results excluded only one of the hair specimens as belonging to Hicks, the others could have been his. However, in view of the uncontradicted testimony that no black male had been in her apartment before the assault and that a black female was there only once briefly almost two years ago, the testimony excluding Hicks as the source of one of the pubic hairs is significant. The State concedes that there is no indication on the record that Cellmark personnel failed to follow their normal protocol so as to cast doubt on the reliability of the results.[2]

If believed by the jury, Word's testimony could cause the jury to have a reasonable doubt that Hicks was the black male that assaulted Diane F. A jury need not reject the testimony of the state crime lab to accept Word's testimony: testimony that a hair specimen is "consistent" with Hicks's hair based on microscopic examination does not necessarily contradict testimony

[2] The State also concedes for purposes of argument that the DNA analysis would be admissible at trial and that the particular technology used by Cellmark, if properly used, is valid for comparative DNA analysis. Since the State submitted its brief, this court has affirmed a trial court's ruling that test results matching a defendant's DNA with DNA on cervical and vaginal swabs taken from the victim were admissible. *State v. Peters*, 192 Wis. 2d 674, 534 N.W.2d 867 (Ct. App. 1995).

that Hicks is excluded as the source of that specimen when DNA analysis is used. The trial court and the State emphasize Diane F.'s positive identification of Hicks. But the DNA testimony, together with some discrepancies between Hicks's physical appearance and Diane F.'s description of the man who assaulted her, could cause the jury to conclude that Diane F. was mistaken in her identification. Under this scenario, the jury could reasonably conclude that the State's evidence on "opportunity" was insufficient for a conviction.

During the trial, the State emphasized the significance of the crime analyst's conclusions on the pubic hairs. It now argues that that evidence was not important to the conviction. We are not persuaded by the State's changed assessment.

For these reasons, under the circumstances of this case, we conclude that there is a probability sufficient to undermine confidence in the outcome that, but for counsel's failure to subject the hair specimens to DNA analysis, the result of the trial would have been different. We therefore reverse and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded with directions.