STATE of Wisconsin, Plaintiff-Respondent,†

v.

Rafael D. HONIG, Defendant-Appellant.

Court of Appeals

*No. 2014AP2968–CR. Submitted on briefs October 6, 2015.—Decided December 22, 2015.*

## 2016 WI App 10

(Also reported in 874 N.W.2d 589.)

† Petition for Review filed.

684

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Colleen Marion*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, attorney general and *Jeffrey J. Kassel*, assistant attorney general.

Before Curley, P.J., Kessler. J., and Daniel L. LaRocque, Reserve Judge.

¶ 1. KESSLER, J. Rafael D. Honig appeals a judgment of conviction, following a jury trial, of one count of first-degree sexual assault—intercourse with a person under age twelve, and one count of first-degree sexual assault—contact with a person under age thirteen. Honig also appeals the order denying his postconviction motion for relief. We conclude that the trial court's determination that Honig's trial counsel was not ineffective was based on errors of law. We reverse.

688

## BACKGROUND

¶ 2. On September 5, 2012, Honig was charged with one count of first-degree sexual assault—intercourse with a person under age twelve, and one count of first-degree sexual assault—contact with a person under age thirteen, stemming from allegations that he inappropriately touched his five-year old granddaughter, Y.H., and his three-year old granddaughter, Y.C. According to the complaint, Y.H. told her uncle, Raymond Cruz, that Honig had been "touching her cookie (vagina) and it burns." Y.H. also told Cruz that Honig put his mouth on her "cookie" and that she observed Honig touching Y.C.'s "cookie." Honig pled not guilty.

¶ 3. During their investigation, Milwaukee police conducted video-recorded forensic interviews with each of the girls. Y.H. was five years old at the time. During Y.H.'s interview, she stated that her grandfather lived in a hotel, and she described an incident in which her grandfather touched her "private" at the hotel. She stated that she was holding her mother's hand in the hotel lobby "seven months ago" and Honig pried her away from her mother by unlinking her fingers "one by one." Honig took Y.H. and her "little cousin" to room number "143," where he touched her "little cousin" by "putting his mouth on her private." Y.H. stated that her mother "was screaming" when she discovered Y.H. was missing and "scratched" on the hotel room door until her fake fingernails came off. Y.H. also called her grandfather "nasty," stating "he always like touches little girls—in the privates." She stated the "little girls" included "like me, my sister, and my . . . cousin, and my . . . other cousin." Y.H. also stated that additional alleged attacks took place at a park and in her house.

¶ 4. Y.C. was three years old at the time. During Y.C.'s interview, Y.C. told police that "abuelo"[1] was in "jail" because "Nene (Y.H.) said grandpa was touching us." Y.C. described an incident in which "Nene was sitting on the bed. Grandpa pulled down his pants then I was standing right by um um um [N]ene. He pulled down my pants, he was doing something to me and I – I was doing something I was – I was [N]ene was watching me." Later in the interview Y.C. said that Honig actually pulled Y.H.'s pants down, after which "[t]he cops came." Y.C. then told police that Honig "didn't do nothing to me" and that she was sleeping when "he just did it to [N]ene."

¶ 5. Prior to trial, the State informed the trial court that it did not plan to show Y.C.'s forensic interview to the jury because, the State asserted, it did not comply with Wis. Stat. § 908.08 (2013–14).[2] Specifically, the State said that the video "didn't go far

---

[1] "Abuelo" translates to "grandfather."

[2] Wisconsin Stat. § 908.08 is titled "Audiovisual recordings of statements of children." As relevant to these proceedings the statute provides:

(1) In any criminal trial or hearing, . . . the court or hearing examiner may admit into evidence the audiovisual recording of an oral statement of a child who is available to testify, as provided in this section.

(2) (a) Not less than 10 days before the trial or hearing, . . . the party offering the statement shall file with the court or hearing officer an offer of proof showing the caption of the case, the name and present age of the child who has given the statement, the date, time and place of the statement and the name and business address of the camera operator . . . .

(b) Before the trial or hearing in which the statement is offered . . . the court or hearing examiner shall conduct a hearing on the statement's admissibility. At or before the hearing, the court shall view the statement. At the hearing, the court or hearing examiner shall rule on objections to the statement's admissibility in whole or

in part. If the trial is to be tried by a jury, the court shall enter an order for editing as provided in s. 885.44(12).

**(3)** The court . . . *shall* admit the recording upon finding all of the following:

(a) That the trial or hearing in which the recording is offered will commence:

1. Before the child's 12th birthday; . . .

. . . .

(b) That the recording is accurate and free from excision, alteration and visual or audio distortion.

(c) That *the child's statement was made upon oath or affirmation or,* if the child's developmental level is inappropriate for the administration of an oath or affirmation in the usual form, *upon the child's understanding that false statements are punishable and of the importance of telling the truth.*

(d) That *the time, content and circumstances of the statement provide indicia of its trustworthiness.*

. . . .

**(5)** (a) If the court or hearing examiner admits a recorded statement under this section, the party who has offered the statement into evidence may nonetheless call the child to testify immediately after the statement is shown to the trier of fact. Except as provided in par. (b), if that party does not call the child, the court or hearing examiner, upon request by any other party, shall order that the child be produced immediately following the showing of the statement to the trier of fact for cross-examination.

. . . .

**(7)** At a trial or hearing under sub. (1), a court or a hearing examiner may also admit into evidence an audiovisual recording of an oral statement of a child that is hearsay and is admissible under this chapter as an exception to the hearsay rule.

telling the truth. The State indicated that it could "get through truth and lie" with Y.C. on the witness stand.

¶ 6. Prior to trial, defense counsel informed the court of a potential defense witness—George Colon. Counsel told the court that Colon was an acquaintance of Cruz. According to defense counsel, Colon would testify that Cruz told Colon that he (Cruz) "knew ways to frame people, including claims of sexual abuse that—and specifically regarding my client, that he had some plan to frame [Honig] by somehow getting kids to say things about things that my client allegedly did." The trial court ruled that (1) defense counsel could question Cruz about Colon's claims, but, (2) if Cruz denied the claims, counsel would not be allowed to impeach Cruz.[3]

¶ 7. Defense counsel's theories of defense were primarily that: (1) Cruz had "some bad feelings towards" Honig, thus Cruz planted the story with the girls; or (2) someone else assaulted the girls. Multiple witnesses then testified at trial.

¶ 8. Police Officer Shannon Orvis testified that he conducted the girls' forensic interviews. He testified that Y.H. understood the difference between the truth and a lie, but stated that Y.C.'s "ability to understand . . . the concept of truth and lie was very, very limited." Y.H.'s entire video was then played for the jury; however, Y.C.'s video interview was not played.

(Emphasis added.) All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

[3] The trial court's conclusion regarding defense counsel's ability to impeach Cruz contradicts Wis. Stat. § 906.13(2)(a)1., thus was incorrect as a matter of law. We discuss this in more detail later.

¶ 9. Y.H. told the jury that Honig put his finger in her "private" and his mouth on her "private" multiple times at multiple locations—her house, a hotel and a park. Y.H. stated that she witnessed Honig do the same to her sister, and that when Honig allegedly assaulted her sister, Y.H. "told mommy. My mommy came in [Honig's] room. She got—she got shocked." Y.H. said that her mother left Honig's room, Honig assaulted Y.C. again, and her mother "got shocked again." Y.H. said that she told her mother "Grandpa had touched me," and that her mother was the first person she told. Later, Y.H. said that Cruz was the first person she told. Y.H. admitted she talked to Cruz "a lot." When asked if Cruz ever told Y.H. to accuse her grandfather of "bad things," Y.H. responded, "I don't remember."

¶ 10. Ziomara Honig, the girls' mother and Honig's daughter, told the jury that Y.H.'s story about being "snatched" from her at a hotel was simply not true. Ziomara indicated that Honig worked at a hotel, but he did not live there. Ziomara testified that she and Y.H. "did go visit [Honig], I did go enter his kitchen, but [the girls] were with me." She stated that Y.H was never "tooken from me or pulled from me in any type of way." Ziomara stated that she never witnessed Honig doing anything inappropriate to her daughters. Ziomara also told the jury that Y.H. had been having nightmares "stating that me and her walking, and somebody comes up and takes her." When asked about the "bad blood" between Cruz and Honig, Ziomara stated "that's their business. If they did I wouldn't know . . . because I don't involve in his or anybody else's lives."

¶ 11. Y.C., age four at the time of trial, was asked a series of questions that could be answered "yes" or

"no." Through this questioning by the State, she communicated to the jury that something she did not "like" happened in Honig's room. Then, using a doll, the State asked Y.C. where on the doll the incident happened. When the prosecutor touched the doll's vaginal area, Y.C. said "yes." Y.C.'s forensic interview, in which she stated Honig "didn't do nothing" to her, was not shown to the jury.

¶ 12. Cruz testified that in August 2012, Y.H. came up to him, "kind of crying," and told him that Honig "put his fingers in her cookie and that it was burning . . . and was putting his mouth all over her cookie." No other family members were present when Y.H. made these statements. Cruz admitted that he and Honig had a "beef" "regarding [a] truck," and as a result, Cruz sent threatening messages to Honig. Cruz denied resenting Honig because Cruz had to move out of Ziomara's home when Honig moved in to make room for Honig. Cruz denied trying to influence the girls to make accusations against Honig.

¶ 13. Honig testified, denying all of the accusations. Honig explained that he and Cruz had a contentious relationship, beginning with Cruz's affair with Ziomara's roommate. Honig also explained why he and Cruz fought over ownership of a truck, and that Cruz resented Honig's financial support of Honig's other daughter, Judith, who was also the mother of Cruz's children. Honig confirmed that Cruz sent him threatening text messages and that Cruz threatened him in person.

¶ 14. The jury found Honig guilty.

## Postconviction Motion and Machner hearing.

¶ 15. Honig, through new counsel, filed a post-conviction motion for relief, alleging ineffective assistance of defense counsel. Specifically, Honig alleged that his defense counsel was ineffective because he: (1) failed to call Colon as a defense witness; (2) failed to object to Y.C.'s testimony because she did not testify under oath; and (3) failed to impeach Y.C.'s testimony that Honig touched her with her forensic interview in which Y.C. stated that Honig did *not* touch her. Honig filed a supplemental postconviction motion adding an allegation that defense counsel was also ineffective for failing to object to the portions of Y.H.'s forensic interview which referred to what would be other acts evidence. Specifically, the portions in which Y.H. stated that Honig "always like touches little girls—in the privates," that Honig touched her, her sister, and two of her cousins, and that Honig touched her little cousin by "putting his mouth on her private."

¶ 16. The postconviction court held a *Machner*[4] hearing. Defense counsel, Benjamin Peirce, testified that his theories of defense were either that Cruz came up with the allegations himself and coached the girls through them, or that someone else assaulted the girls. Peirce testified that he considered calling Colon as a witness, but did not subpoena him. He stated that he did not recall the trial court's ruling about whether he could ask Cruz about the alleged conversation between Cruz and Colon. Peirce said that he did not recall why he did not question Cruz. He stated that he did not recall whether Colon would be available as a witness,

---

[4] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

but did recall seeing Colon in court on the first day of trial. Peirce stated that after the first day of trial he was not sure whether Colon would be a cooperative witness, but admitted that he did not recall whether that truly was his reason for not calling Colon to testify, stating "I don't recall that's exactly why I didn't call him or try to call him."

¶ 17. Colon testified at the *Machner* hearing. Colon said that in August 2012, just weeks before Y.H.'s allegations to Cruz, Cruz told Colon that:

> he (Cruz) was so proud about when he lived in New York and stuff about getting rid of people that he disliked and things that they did, and he brought up about how to get rid of a person, a drug dealer. He also brought up about using children to make accusations against adults, especially people that have some type of conviction.

¶ 18. Colon clarified that "getting rid of someone" meant "[c]all[ing] the police on them." Colon said that Cruz talked about how to "get children and counsel them and to charge somebody with molestation." Colon stated that he was aware of Cruz and Honig's contentious relationship and their dispute over the truck. Colon also stated that he spoke with Peirce multiple times about being a witness and went to court every day of the trial, but was eventually told by Peirce that he was not needed.

¶ 19. Peirce did not recall Y.H.'s statements, nor did he recall why he failed to attempt to limit them. Peirce did not recall the portions of Y.H.'s forensic interview in which she accused Honig of touching other little girls until Honig filed his postconviction motions. Peirce admitted that he did not consider filing a motion *in limine* to redact those portions, nor

696

did he consider asking for a limiting jury instruction. According to Peirce, he did not object to Y.C. not taking an oath prior to testifying because of her age. He did not consider using Y.C.'s forensic interview as a prior inconsistent statement. Peirce said he thought that her testimony at trial was "fairly consistent" with her interview.

¶ 20. The postconviction court concluded that Peirce's failure to call Colon was "trial strategy" and that because the jury was aware of the "bad blood" between Cruz and Honig, Honig was not prejudiced by Colon's absence. The court found that Y.C.'s testimony was generally consistent with her forensic interview and that Honig was not prejudiced by Y.H.'s other acts comments. However, the court also opined that if Peirce had filed a motion *in limine* to limit the other acts comments in Y.H.'s forensic interview, the motion would have been granted.

¶ 21. This appeal follows.

## DISCUSSION

¶ 22. Honig raises the same arguments on appeal that he raised in his postconviction motion. He alleges that defense counsel was ineffective for: (1) failing to call Colon as a defense witness; (2) failing to impeach Y.C. with her forensic interview; and (3) failing to file a motion *in limine* to redact portions of Y.H.'s forensic interview in which she accuses Honig of "always" assaulting other little girls.

### Standard of Review.

¶ 23. Wisconsin has long recognized that in a criminal case "[t]he right to counsel is more than the

697

right to nominal representation. Representation must be effective." *State v. Felton*, 110 Wis. 2d 485, 499, 329 N.W.2d 161 (1983). " 'Ineffectiveness is neither a judgment of the motives or abilities of lawyers nor an inquiry into culpability. The concern is simply whether the adversary system has functioned properly.' " *Id.* (citation omitted). We follow a two-part test for ineffective assistance of counsel claims. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). A defendant must prove both that his or her attorney's performance was deficient and that the deficient performance was prejudicial. *Strickland*, 466 U.S. at 687. "[A]n attorney's performance is deficient if the attorney made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *State v. Allen*, 2004 WI 106, ¶ 26, 274 Wis. 2d 568, 682 N.W.2d 433 (citations and quotation marks omitted). "The defendant must also show the performance was prejudicial, which is defined as 'a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.' " *Id.* (citation omitted). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (citation omitted). "A movant must prevail on both parts of the test to be afforded relief." *Id.*

■■■■

¶ 24. "Counsel's decisions in choosing a trial strategy are to be given great deference." *State v. Balliette*, 2011 WI 79, ¶ 26, 336 Wis. 2d 358, 805 N.W.2d 334. A reviewing court can determine that defense counsel's performance was objectively reasonable, even if trial counsel offers no sound strategic reasons for decisions made. *See State v. Koller*, 2001

WI App 253, ¶ 53, 248 Wis. 2d 259, 635 N.W.2d 838, *modified on other grounds by State v. Schaefer*, 2003 WI App 164, 266 Wis. 2d 719, 668 N.W.2d 760. We will sustain counsel's strategic decisions as long as they were reasonable under the circumstances. *See Balliette*, 336 Wis. 2d 358, ¶ 26.

¶ 25. We review the trial court's findings of fact regarding counsel's conduct under a clearly erroneous standard. *See State v. Pitsch*, 124 Wis. 2d 628, 633–34, 369 N.W.2d 711 (1985). An erroneous exercise of discretion occurs if the record demonstrates that the facts do not support the postconviction court's decision or that the postconviction court applied the wrong legal standard. *State v. Brockett*, 2002 WI App 115, ¶ 18, 254 Wis. 2d 817, 647 N.W.2d 357. Whether the facts found constitute deficient performance and prejudice are questions of law that we review independently. *See State v. Tulley*, 2001 WI App 236, ¶ 5, 248 Wis. 2d 505, 635 N.W.2d 807.

**Failure to Call Colon as a Witness.**

*Deficient Performance—Failure to present Colon's testimony.*

¶ 26. Honig argues that defense counsel's failure to call Colon as a witness was both deficient and prejudicial because Colon's testimony went to the core of the defense theory that Cruz convinced Y.H. to falsely accuse Honig. We agree.

¶ 27. "Failure to call a potential witness may constitute deficient performance." *State v. Jenkins*, 2014 WI 59, ¶ 41, 355 Wis. 2d 180, 848 N.W.2d 786. An

attorney's failure to call a witness whose testimony would have been central to the theory of defense can constitute deficient performance. *State v. White*, 2004 WI App 78, ¶¶ 20–21, 271 Wis. 2d 742, 680 N.W.2d 362 (defense counsel's performance was deficient for failure to call witnesses who would have brought in evidence that "went to the core of [the] defense").

¶ 28. At the *Machner* hearing, when Peirce was asked why he did not question Cruz about the conversation with Colon, Peirce could not recall. Peirce could not recall why he did not call Colon to testify, although he thought, *possibly*, Colon had a surgery scheduled and, *possibly*, that Colon would be an uncooperative witness. Peirce could not recall whether these were the *actual* reasons, nor could he explain why he thought Colon *might* have been an uncooperative witness. This failure of memory does not articulate a factual basis for a reasonable strategic decision not to have Colon testify. However, we are still required to consider, based on all of the information available to counsel at the time, whether counsel's trial decision was objectively reasonable. *See Koller*, 248 Wis. 2d 259, ¶ 8.

¶ 29. The entire case turned on credibility of the witnesses; there was no physical evidence of any kind. Counsel knew, or should have known, that Colon's reports of Cruz's statements would have a significant impact on Cruz's credibility. Yet, counsel failed to ask Cruz about them. Had Cruz denied telling Colon that he knew how to "get rid people" by convincing children to accuse those people of molestation, Colon's testimony would have been admissible as a prior inconsis-

tent statement. *See* Wɪs. Sᴛᴀᴛ. § 906.13(2)(a)1.[5] The trial court's ruling to the contrary (that if Cruz denied such a conversation, defense counsel would not be permitted to impeach Cruz) was incorrect. If Cruz admitted the conversation with Colon, counsel's theory of defense would have had additional important support. Because both alternatives operated to enhance the defense theory in a significant way, there was no reasonable strategic reason articulated, or presented in the record, not to question Cruz about the assertion and not to present Colon's testimony.

¶ 30. It is undisputed that Colon was present for the first day of trial. Colon testified at the *Machner* hearing that he was actually present every day of the trial, but was told by counsel that he (Colon) was not needed. "Trial counsel's decisions must be based upon facts and law upon which an ordinarily prudent lawyer would have then relied." *Felton*, 110 Wis. 2d at 503. This standard "implies deliberateness, caution, and circumspection" and the decision "must evince reasonableness under the circumstances." *Id.* at 502. Counsel articulated no tactical reason "impl[ying] deliberateness, caution, and circumspection" for failing to call Colon as a witness. *See id.* The record is devoid of any factual basis for a strategy which supports counsel's failure to call Colon as a witness. Thus, the postconviction court's finding that counsel's decision was strategic is not supported by counsel's *Machner* testimony. *See Felton*, 110 Wis. 2d at 502. (reviewing court does not ratify a lawyer's decision simply because it is

---

[5] Because Cruz was available to testify, Colon's statements would have been admissible pursuant to Wɪs. Sᴛᴀᴛ. § 906.13(2)(a)1.

701

labeled "trial strategy" by postconviction court). These failures were deficient performance.

¶ 31. Surprisingly, counsel stated at the *Machner* hearing that his theory of defense essentially shifted from the theory that Cruz made up the allegations against Honig and coached the children to a theory that someone else assaulted the girls. Contrary to this *Machner* testimony, the trial record demonstrates that defense counsel maintained the theory that Cruz created the allegations *throughout the entire trial*. Counsel did present evidence that multiple people had access to the girls, but conceded that he never identified another possible perpetrator to the jury. Counsel questioned each of the girls about their relationship with Cruz and asked whether Cruz influenced their accusations. Counsel also questioned Ziomara about the "beef" between Cruz and her father, and questioned both Cruz and Honig about the "bad blood" between them. Clearly, counsel's defense rested on the theory that Cruz convinced the girls to falsely accuse Honig. The failure to present Colon's testimony and to question Cruz about the substance to which Colon would testify was a failure to present available evidence that went to the core of the defense theory. As such, counsel's performance was deficient.

*Prejudice.*

¶ 32. "Whether counsel's deficient performance satisfies the prejudice prong of *Strickland* depends upon the totality of the circumstances at trial." *Jenkins*, 355 Wis. 2d 180, ¶ 50. In evaluating the totality of the evidence in the trial, we conclude that Honig demonstrated that but for counsel's failure to present Colon's testimony and to question Cruz about

the substance to which Colon would testify, it is probable that a different result would have occurred.

¶ 33. The State's case depended on the jury believing the children and Cruz. There was no physical evidence that either Y.H. or Y.C. had been assaulted. There were no witnesses to the alleged assaults. Defense counsel had available information that would have enhanced Honig's credibility while simultaneously casting doubt on the credibility of Cruz and the children. The jury did not hear this testimony. Colon's testimony gave substance to the defense theory that Cruz and Honig's relationship was so contentious that Cruz made up the allegations and coached the girls to go along with them. This was not merely cumulative; Colon was an independent source of information that, if the jury believed Colon, had damning evidence of Cruz's character and intentions. Honig was entitled to have the jury hear this. The lack of Colon's testimony was prejudicial to Honig. Thus, Honig has demonstrated ineffective assistance of counsel as to this aspect of counsel's performance.

**"Other Acts Evidence. "**

*Deficient Performance—Failure to impeach child witnesses.*

¶ 34. Honig contends that his defense counsel was ineffective for failing to exclude statements that Honig allegedly abused other children. During Y.H.'s forensic interview, which was played for the jury, Y.H. told Orvis that Honig "always like touches little girls – in the privates." Y.H. said the little girls included, "like me, my little sister, and . . . my cousin, and my . . .

other cousin." She told Orvis that Honig "put[] his mouth on her [little cousin's] private" while they were at the hotel.

¶ 35. WISCONSIN STAT. § 904.04(2)(a) provides:

> Except as provided in par. (b)2., evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶ 36. Under appropriate circumstances, WIS. STAT. § 904.04(2) allows other acts evidence to be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Hunt*, 2003 WI 81, ¶ 29, 263 Wis. 2d 1, 666 N.W.2d 771. Whether other acts evidence should be admitted requires the application of a three-part test: (1) whether the evidence is offered for a permissible purpose under WIS. STAT. § 904.04(2)(a); (2) whether the evidence is relevant under WIS. STAT. § 904.01; and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the jury, or needless delay. *See* WIS. STAT. § 904.03; *State v. Sullivan*, 216 Wis. 2d 768, 772–73, 576 N.W.2d 30 (1998). According to Honig, the statements in the video were not offered for any acceptable purpose, but rather were "inflammatory" and "prejudicial."

¶ 37. At the *Machner* hearing, the postconviction court stated that had defense counsel sought to exclude the statements, the court likely would have

granted a motion *in limine.* To grant that motion, the court necessarily would have found that the evidence was offered only "to prove the character of [Honig] in order to show that [he] acted in conformity therewith" and not for some other proper purpose. *See* WIS. STAT. § 904.04(2)(a). We agree with the court's conclusion. There was no other proper purpose apparent from the record; the statements of Y.H. were offered only to attempt to show that Honig generally abused children. Counsel's failure to object to the use of these statements, either *in limine* or at trial, was deficient performance.

*Prejudice.*

¶ 38. The court found, with regard to Y.H.'s statements, that "in the totality of all the evidence and the credibility determination that had to be made, I don't think that it would have resulted in a different outcome." The postconviction court made no other findings of fact regarding this issue. Defense counsel offered no reason for failing to object or seek to redact the statements; he admitted that he did not even remember these statements until Honig filed his postconviction motion and had not even considered filing a motion *in limine* to redact those parts of the interview.

¶ 39. We independently determine whether Honig's defense was prejudiced by counsel's failure to move to redact Y.H.'s statements. *See State v. Jeannie M.P.*, 2005 WI App 183, ¶ 6, 286 Wis. 2d 721, 703 N.W.2d 694 (whether counsel's performance was prejudicial is a legal question we decide *de novo*). There was no physical evidence to support the alleged assaults. The "totality of the evidence," was witness testimony, including the mother of the two children contradicting

many of the improbable claims Y.H. made during her video interview (e.g., that her mother scratched on a hotel door until her fake nails came off; that she was "snatched away" from her mother at a hotel and her mother screamed for her; that her mother "got shocked" by Honig's conduct, then came back and "got shocked" again). The entire case depended on whether the jury believed Honig or the other witnesses. The jury could hardly have considered Y.H.'s statements as anything other than evidence that Honig had a propensity to assault little girls. We conclude that counsel's failure to move to redact those statements by Y.H. prejudiced Honig's defense.

## Impeachment with Y.C.'s Prior Inconsistent Video Statement.

*Deficient Performance.*

¶ 40. Honig contends that counsel was ineffective for failing to introduce portions of Y.C.'s forensic interview, which differed dramatically from Y.C.'s trial testimony. Y.C.'s trial testimony consisted of a series of questions by the State which could be answered "yes" or "no." The State's questions ended with Y.C. answering "yes" when the prosecutor put her finger between a doll's legs and asked Y.C. if Honig touched her there.

¶ 41. In Y.C.'s forensic interview, she stated that Honig "didn't do nothing to me." Defense counsel did not play that interview for the jury. Relevant portions of Y.C.'s interview by Orvis include the following statements:

> [Y.C.]: [Honig] pulled down on my pants then . . . I don't know what he was doing to us[.]

[Orvis]: Ok, well what did you see? and what did you hear?

[Y.C.]: Nene (Y.H.) was sitting on the bed. [Honig] pulled down his pants then I was standing right by um um um [N]ene. He pulled down my pants, he was doing something to me and I - I was doing something I was – I was [N]ene was watching me he went to me that's right then he said and he gave me a kiss[.]

[Orvis]: Ok where did he give you a kiss?

[Y.C.]: On-on my cheek[.]

. . . .

[Orvis]: ok, ok. Now you said that you were with [N]ene and your grandpa in your grandpa's room and your grandpa took someone's pants down[.]

[Y.C.]: He took [N]ene's pants down[.]

. . . .

[Orvis]: Ok. What did you see?

[Y.C.]: I saw somebody I saw somebody pull down them pants, [N]ene[.]

. . . .

[Y.C.]: He didn't do nothing to me[.]

[Orvis]: He didn't do anything to you? Ok. Did he do anything to anybody else?

[Y.C.]: He just did it to [N]ene. I was, I was in the room sleeping[.]

¶ 42. Although Y.C. was only four years old during the trial, it is well established that the credibility of all witnesses, including child witnesses, and the

weight assigned to their testimony are matters for the jury's judgment. *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 681, 280 N.W.2d 226 (1979).

¶ 43. At the *Machner* hearing, defense counsel's only reason for failing to impeach Y.C. was that he thought her trial testimony was "fairly consistent" with her forensic testimony. The postconviction court noted that there "are some things that are inconsistent" between the forensic interview and the trial testimony, but also noted that "[t]here are some things that are consistent." The court found counsel's answer to be "a valid trial strategy . . . not to seek to admit [the relevant portions of the interview] and then run the risk under the rule of completeness that the whole thing would come in."[6]

¶ 44. The postconviction court correctly noted that there were both consistencies and inconsistencies between Y.C.'s forensic interview and her trial testimony; however, the court's implication that counsel's decision was driven by the "rule of completeness" is not supported by the record. Defense counsel did not testify that he sought to avoid "run[ning] the risk under the rule of completeness that the whole [interview] would come in." Instead, counsel apparently had no idea at the time of trial that the video was inconsistent with Y.C.'s trial testimony in major ways. We conclude that these failures were deficient performance.

---

[6] The rule of completeness applies when a partial statement is admitted into evidence and hearing the remainder of the statement would be necessary to avoid giving the jury an unfair and misleading impression of what the witness said. *See State v. Eugenio*, 219 Wis. 2d 391, 411, 579 N.W.2d 642 (1998).

708

*Prejudice.*

¶ 45. In her forensic interview, Y.C. initially stated that Honig pulled her pants down, but then retracted and stated that Honig "didn't do nothing" to her. She also stated that she saw Honig pull down Y.H.'s pants, but then stated that she was actually sleeping when that incident happened. In the video interview shortly after the allegation was made, Y.C. did not claim any actions by Honig that amounted to *sexual contact*, while at trial months later she responded to leading questions by the State which culminated in a claim of sexual contact. Thus, the postconviction court's conclusion that counsel's decision was strategic is refuted by counsel's own testimony.

¶ 46. Orvis testified that Y.C. did not fully comprehend the difference between the truth and a lie. Had the jury been presented with Y.C.'s interview after her trial testimony, the jury would have seen this lack of comprehension first-hand. The jury also would have seen Y.C.'s natural demeanor and her ability to communicate when asked open-ended questions. In a case that hinged on witness credibility, including the credibility of a four-year old witness, counsel presented no strategic reason for failing to present her forensic interview, or for failing to draw attention to the inconsistencies between Y.C.'s trial testimony and her forensic interview. We conclude that counsel's failure to introduce the forensic interview and its inconsistencies was deficient performance, and that the failure to impeach Y.C. was prejudicial to Honig's case.

¶ 47.　For the forgoing reasons, we conclude that counsel was ineffective in the multiple respects described above, all of which cumulatively deprived Honig of a fair trial. We reverse and remand for a new trial.

*By the Court.*—Judgment and order reversed and cause remanded.