PER CURIAM.
¶ 1 Peter Hanson appeals a judgment, entered after a jury trial, convicting him of first-degree intentional homicide as a party to the crime. He also appeals an order denying his post-conviction motion. Hanson contends that the admission at trial of statements made by his now-deceased wife violated his constitutional right to confrontation. He also argues that his trial counsel provided ineffective assistance by failing to call any potentially exculpatory witnesses and by failing to challenge the admission of Hanson's earlier John Doe testimony as being in violation of Miranda .[1] We conclude that, even assuming Hanson's right to confrontation was violated, any error was harmless. We further conclude that Hanson's trial counsel did not perform deficiently by failing to call any witnesses and that Hanson has failed to show he was prejudiced by counsel's failure to object to his John Doe testimony. Accordingly, we affirm.
BACKGROUND
¶ 2 Chad McLean went missing on the night of February 22, 1998. His body was found a month later in the Pensaukee River, wearing the same clothes as worn on the day he disappeared, with four gunshot wounds to the head. The body's recovery site was 1.3 miles downstream from Hanson's property, which bordered the river. The case went cold until 2009, when Hanson's estranged wife, Kathy Hanson, told investigators that Hanson had killed McLean.
¶ 3 McLean, a Green Bay resident, was in Oconto County with his friend, Cory Byng, on the day he disappeared. After spending the afternoon fishing, Byng drove McLean to Byng's uncle's house for a cookout. Hanson and Chuck Mlados also went to the cookout, arriving together in a pickup truck driven by Hanson. Around 7:00 p.m., McLean and Byng got into a fight. This led to Byng's uncle taking Byng's car keys away from him, and Byng spent the entire evening passed out on the kitchen floor. McLean arranged to get a ride back to Green Bay from Mlados.
¶ 4 At around 9:30 or 10:00 p.m., Hanson left the house with McLean and Mlados, intending to drive the three of them to Hanson's home to retrieve Mlados' truck. According to what Hanson told investigators, after leaving the house Mlados decided not to drive back to Green Bay that night. Hanson said that he and Mlados therefore dropped McLean off at the Hi-Way Restaurant and Truck Stop (the Hi-Way).
¶ 5 The Hi-Way surveillance camera footage from that night showed Hanson and Mlados buying beer at 9:53 p.m. McLean did not appear on any surveillance camera footage taken from either outside or inside the Hi-Way. At trial, six employees also testified that they did not see anyone fitting McLean's description at the Hi-Way that night.
¶ 6 In 2012, the Oconto County Circuit Court held a John Doe hearing. Hanson testified extensively at the hearing, doing so only after the circuit court gave him a Miranda warning.[2] His testimony included a statement that Kathy had told police she believed Hanson had killed McLean. Hanson was ultimately charged with first-degree intentional homicide as a party to the crime. At trial, the State attempted to have Hanson's John Doe hearing testimony read into evidence. Hanson objected on confrontation and hearsay grounds. The circuit court overruled Hanson's objection, concluding that because it was Hanson's own testimony, not Kathy's, being read into evidence, there was no hearsay or confrontation issue and thus the evidence was admissible. Accordingly, Hanson's John Doe testimony was read to the jury.
¶ 7 The jury also heard from three witnesses that Hanson confessed to killing McLean. Kenneth Hudson testified that he had been Hanson's best friend and that about two months after McLean's body was found, Hanson told him that he had shot McLean and dumped his body in the river. Barry O'Connor testified that he was a drinking buddy of Hanson's in the mid-2000s and Hanson told him that about ten years earlier he and his friend had accidentally killed somebody and had dumped the body in a river. O'Connor also testified that Hanson told him he had confessed the murder to his wife, but that she could not testify against him because she was now dead. Jeremy Dey testified that he met Hanson in jail in the fall of 2013 and that Hanson told him that he had shot McLean and dumped his body in a river. Dey also testified that Hanson told him his wife had given the police a statement about the murder that was against Hanson's interests.
¶ 8 The State's case-in-chief also included testimony regarding the fatal gunshot wounds. A forensic pathologist testified that the four gunshot wounds to McLean's head were in a straight line and regularly spaced, a pattern consistent with automatic gunfire. A firearms expert testified that the bullets recovered from McLean's body were .22 caliber. And a detective testified that .22 caliber firearms were rarely available as fully automatic weapons. Multiple witnesses testified that Hanson had a modified .22 caliber rifle capable of fully automatic fire.
¶ 9 Hanson called no defense witnesses at trial, and he chose not to testify. Instead, the defense's position in its closing argument was that, due to the circumstantial nature of the case, the State had failed to meet its burden to prove beyond a reasonable doubt that Hanson had killed McLean. During its deliberations, the jury asked the circuit court if it could review anything that pertained to Kathy Hanson's statement to police. The court denied the request, and the jury ultimately found Hanson guilty of first-degree intentional homicide as a party to the crime. The court imposed a sentence of life imprisonment without the possibility of parole.
¶ 10 Hanson filed a post-conviction motion seeking, in relevant part, a new trial based upon the alleged ineffective assistance of his trial counsel.[3] The circuit court held a Machner[4] hearing. Hanson's trial counsel testified at the hearing that his strategy was to focus on the lack of physical evidence in arguing that the State did not prove beyond a reasonable doubt that Hanson was guilty. Counsel testified that he could not recall his specific rationale for not calling each witness Hanson claimed would have provided exculpatory evidence. However, counsel testified that his general philosophy when pursuing an insufficient evidence defense is that an unconvincing alternate theory of what occurred undercuts such an argument. Counsel also testified that he did not object to the admission of Hanson's John Doe testimony on Miranda grounds because he did not believe Miranda warnings were required at a John Doe hearing. In a written order, the circuit court denied the post-conviction motion. This appeal follows.
DISCUSSION
A. Confrontation Clause
¶ 11 Hanson first argues that the circuit court improperly admitted portions of his John Doe hearing testimony at trial. Specifically, he contends his testimony that his wife told police he killed McLean was inadmissible hearsay and its admission violated his rights under the Confrontation Clause of the Sixth Amendment. Further, he argues the admission of this testimony was not harmless because the jury requested to see evidence regarding Kathy's statement during its deliberations.
¶ 12 The State argues the circuit court correctly concluded that Hanson's John Doe testimony did not contain any hearsay and thus there was no confrontation issue. Alternatively, the State argues that even if the circuit court erred, the error was harmless because the objected-to evidence was insignificant and cumulative.
¶ 13 Assuming, without deciding, that admitting the John Doe testimony was error, we conclude it was harmless. "A Confrontation Clause violation does not result in automatic reversal, but is subject to harmless error analysis." State v. Deadwiller , 2013 WI 75, ¶ 41, 350 Wis. 2d 138, 834 N.W.2d 362. "For an error to be harmless, the party who benefitted from error must show that 'it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " Id. (quoting State v. Martin , 2012 WI 96, ¶ 45, 343 Wis. 2d 278, 816 N.W.2d 270 ). Factors that may be considered in a harmless error analysis include: "the importance of the erroneously admitted evidence; the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; [and] whether the erroneously admitted evidence duplicates untainted evidence[.]" Id.
¶ 14 Here, we are persuaded that any error in the admission of the challenged evidence was harmless because it duplicated other, unchallenged testimony. The jury heard testimony from three witnesses that Hanson had confessed to killing someone and dumping the body in a river. Moreover--and critical to our harmless error analysis--the jury heard from two witnesses that Hanson told them he confessed the killing to his wife, and from one witness that his wife made a statement to police regarding Hanson's involvement in McLean's killing. Hanson does not challenge the admissibility of those witnesses' testimony on appeal.
¶ 15 We are unpersuaded by Hanson's argument that the jury's request to see evidence regarding Kathy's statement shows the admission of the John Doe testimony was not harmless. Not only was the request denied, but, as just discussed, the jury heard about Kathy's statement to police through other, unchallenged testimony. Therefore, any consideration given by the jury to the fact that Kathy talked to police was based on properly admitted evidence. We are convinced beyond a reasonable doubt that a rational jury would have found Hanson guilty, even if it had not heard within Hanson's John Doe testimony that his wife told police she believed he killed McLean.
B. Ineffective assistance of trial counsel
¶ 16 Hanson next argues that his trial counsel provided ineffective assistance in two respects. First, counsel failed to call any potentially exculpatory witnesses. Second, counsel failed to object to the admission of Hanson's John Doe testimony on the grounds that he was not given a proper Miranda warning.
¶ 17 Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel. State v. Balliette , 2011 WI 79, ¶ 21, 336 Wis. 2d 358, 805 N.W.2d 334 (citing Strickland v. Washington , 466 U.S. 668 (1984) ). To establish ineffective assistance of counsel, a defendant must show both that his or her counsel's performance was deficient and that the deficient performance resulted in prejudice to the defense. Id.
¶ 18 Our review of counsel's performance is highly deferential. See State v. Jenkins , 2014 WI 59, ¶ 36, 355 Wis. 2d 180, 848 N.W.2d 786. The defendant must show that the attorney's representation fell below an objective standard of reasonableness under all of the circumstances. Id. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland , 466 U.S. at 687. We will attempt to reconstruct the circumstances under which defense counsel made his or her decisions when evaluating the reasonableness of counsel's conduct. Jenkins , 355 Wis. 2d 180, ¶ 36. In assessing counsel's performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland , 466 U.S. at 689. Counsel's decisions based on a reasonably sound strategy, without the benefit of hindsight, are "virtually unchallengeable," and do not constitute ineffective assistance. Id. at 690-91.
¶ 19 A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. State v. Sholar , 2018 WI 53, ¶ 45, 381 Wis. 2d 560, 912 N.W.2d 89. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Jenkins , 355 Wis. 2d 180, ¶ 37. Accordingly, a defendant making an ineffective assistance challenge "must establish that but for his lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." Sholar , 381 Wis. 2d 560, ¶ 45. Thus, "it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland , 466 U.S. at 693. If a defendant fails to make a sufficient showing on either prong of the Strickland test, we need not address the other prong. Id. at 697.
¶ 20 Whether a circuit court properly granted or denied relief on an ineffective assistance of counsel claim presents a mixed question of fact and law. Jenkins , 355 Wis. 2d 180, ¶ 38. We review a circuit court's findings of historical fact-including its findings of the circumstances of the case and defense counsel's conduct-using the clearly erroneous standard. Id. However, whether counsel's conduct constitutes ineffective assistance of counsel is a question of law, which we review de novo. Id.
1. Failure to call witnesses
¶ 21 Hanson contends that his trial counsel was deficient for not calling witnesses whom he believes could have provided exculpatory testimony. Hanson points to the statements of the following individuals that were provided to his trial counsel in pretrial discovery to argue that his trial counsel should have called witnesses in Hanson's defense:
Lila Hetrick. Hetrick gave a statement to police in 2001 that McLean called her from the Hi-Way on the night he went missing. She said that she got the impression that he was scared and that there were people at the truck stop waiting for him.
Angelia Snow . Snow told investigators in March 1998 that she went to the Hi-Way around midnight on the night McLean disappeared and saw two men sitting outside, one of whom she said might have been McLean.
Pamela Smith and Beatrice Ambrosius. Smith and Ambrosius, both waitresses at a De Pere restaurant, told investigators in March 1998 that six days after McLean disappeared they saw a man who resembled him eating at their restaurant.
Susan Patton. Patton spoke with investigators in March 1998 and told them that at around 9:45 p.m. on the night McLean went missing, she saw a man in a dark jacket and a baseball cap walking on the side of the road. She believed he was walking away from the Hi-Way.
Jerome Cichocki. Cichocki told Green Bay police in March 1998 that he and his wife saw a man that resembled McLean walking alongside Highway 41 in Green Bay, six days after McLean disappeared. He said that later that day his wife drove by the same spot and saw a cardboard sign with "Milwaukee" on it, but she did not see the man there.
Tina Krake. Krake told investigators in 2004 that Byng confessed to her that he had killed McLean.
¶ 22 Hanson argues that these witnesses were exculpatory because they would have collectively undermined the State's theory that Hanson never took McLean to the Hi-Way and they would have bolstered a defense that Hanson was not McLean's killer. The State argues, and the circuit court concluded, that the decision not to call these witnesses was part of a reasonable defense strategy to focus strictly on an insufficiency of the evidence defense rather than distracting the jury with alternate theories concerning McLean's cause of death.
¶ 23 As explained below, none of these witnesses could have provided testimony that was directly exculpatory, and some of their testimony could have actually tended to incriminate Hanson. And, as also explained below, the jury would have likely found a substantial amount of the testimony either incredible or irrelevant. Therefore, we conclude that counsel did not perform deficiently in deciding not to call any witnesses and to instead focus on arguing to the jury that the State had not proved Hanson's guilt beyond a reasonable doubt. See State v. Hubanks , 173 Wis. 2d 1, 28, 496 N.W.2d 96 (Ct. App. 1992) (holding that focusing on an insufficiency of the evidence defense and foregoing possible alternate defenses is a reasonable defense strategy).
¶ 24 Hetrick, Patton, and Snow all could have testified that McLean was either at or in the vicinity of the Hi-Way on the night he disappeared. However, Hetrick's testimony--that McLean called her and told her that he was scared and that men were waiting for him--may have hurt the defense. Undisputed testimony established that McLean left Byng's uncle's house with Hanson and Mlados, and Hanson's own version of events was that he took McLean to the Hi-Way. Thus, one reasonable inference is that Hanson and Mlados were the men Hanson feared. Patton could have testified that she saw a man fitting McLean's description walking away from the Hi-Way at 9:45 p.m. This testimony would have been contradicted by Snow's testimony that she saw a man fitting McLean's description sitting outside the Hi-Way around midnight.
¶ 25 Even if the jury believed any of these three witnesses and accepted that McLean at some point was at the Hi-Way on the night he disappeared, that fact would not have undermined the bulk of the State's case against Hanson. This would include: the location where the body was found; the unusual pattern of the gunshot wounds linked to a rare firearm of a type to which Hanson had access; and the confessions Hanson made to three witnesses.
¶ 26 Ambrosius', Smith's and Cichocki's testimony could have established that a man resembling McLean was seen six days after he disappeared, in the vicinity of Green Bay. For this implausible testimony to be believed, however, the jury would have had to accept that McLean disappeared in Oconto County, briefly resurfaced six days later in the vicinity of his home, and was then murdered. Yet, somehow, his body was found in close proximity to the area where he originally disappeared, wearing the same clothing he wore on the evening of his disappearance.
¶ 27 Finally, Krake's testimony could have pointed to Byng as an alternate suspect. However, no other evidence incriminated Byng, and uncontroverted evidence established that he had spent the entire night McLean went missing passed out on the kitchen floor of his uncle's house.
¶ 28 Hanson insists that his trial counsel's decision not to call either some or all of these witnesses cannot be considered part of a reasonable trial strategy because their testimony would have been consistent with counsel's defense theory. However, trial counsel testified at the Machner hearing that when pursuing an insufficiency of the evidence defense he views the calling of witnesses as undermining that defense. In other words, counsel viewed calling witnesses as inconsistent with his theory of defense.
¶ 29 Hanson also insists that because his trial counsel's Machner testimony was based on his general strategy, not his specific memory of Hanson's trial, his testimony was based upon hindsight that cannot be considered to determine if he performed deficiently. But a reviewing court must consider all information available to counsel in order to determine whether counsel's strategy was objectively reasonable. State v. Honig , 2016 WI App 10, ¶ 28, 366 Wis. 2d 681, 874 N.W.2d 589. This information may include reasons that an attorney overlooked, or even disavowed. State v. Koller , 2001 WI App 253, ¶ 8, 248 Wis. 2d 259, 635 N.W.2d 838. Thus, we need not determine whether trial counsel actually believed at the time that not calling witnesses would undermine his insufficiency of the evidence strategy. Instead, the issue is whether that decision constituted deficient performance.
¶ 30 We conclude that counsel's decision did not constitute deficient performance. The testimony of the witnesses that Hanson faults his trial counsel for failing to elicit would have been either incriminating to Hanson, irrelevant, or difficult for the jury to believe. Instead of calling these witnesses, defense counsel reasonably chose to argue to the jury that the State had failed to meet its burden to prove beyond a reasonable doubt that Hanson had killed McLean. We determine Hanson failed to show his counsel made errors so serious that counsel was not functioning as the counsel guaranteed to him by the Sixth Amendment.
2. Failure to object to John Doe testimony
¶ 31 Hanson also contends that his trial counsel was deficient by failing to object to his John Doe testimony on the grounds that he was not properly read his Miranda rights before testifying. The State responds that the law on this issue is not settled and, as a result, counsel cannot be found deficient for failing to object. Regardless of whether counsel was deficient for failing to object to the admission of this testimony on Miranda grounds, we are convinced that such error was not prejudicial to Hanson's defense.
¶ 32 In support of his prejudice claim, Hanson points to the fact that the State introduced evidence of his now-deceased wife's statement to police through his John Doe testimony. But, as discussed above, we are convinced beyond a reasonable doubt that a rational jury would have convicted Hanson, even if it had not heard his John Doe testimony regarding Kathy's statement, because that that testimony merely duplicated other, unchallenged testimony. Therefore, Hanson has not shown his counsel's failure to object to the admission of this testimony on Miranda grounds prejudiced his defense.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Miranda v. Arizona , 384 U.S. 436 (1966).

At the John Doe hearing, the circuit court informed Hanson that his testimony could be used against him in the John Doe proceeding or in another legal proceeding, that he had the right to have an attorney present during his testimony, and that he could stop the questioning in order to consult an attorney. The court did not inform Hanson that the State would appoint an attorney for him if he could not afford one. Hanson stated he did not wish to have an attorney present during the hearing, and that no one made any threats or promises to persuade him to give up his right to consult with an attorney or have an attorney present.

Hanson also argued that he was entitled to a new trial due to the State's failure to preserve exculpatory evidence. He does not maintain this claim on appeal and we will not address the issue.

State v. Machner , 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).