BRENNAN, J.
¶1 Harvey A. Talley appeals judgments of conviction, entered on a jury verdict, for multiple crimes related to sexual contact with A.D., the teenage daughter of his wife. On appeal, he challenges only the conviction for first-degree sexual assault causing pregnancy.[1] The charge was based on A.D.'s allegation, which she later recanted, that in early 2014 Talley had forced her to have sexual intercourse and that he was the father of her child, born in November 2014. Talley also appeals the order denying his postconviction motion after an evidentiary hearing.
¶2 At trial, A.D. testified on cross-examination by defense counsel that she had lied to police when she said Talley raped her and that the pregnancy in truth resulted from a consensual sexual relationship with Talley when she was sixteen. Talley argued in his postconviction motion that his trial counsel rendered ineffective assistance because during his cross-examination of A.D., when he questioned her about her statement to the defense investigator about lying about the rape, he failed to question her about the reasons she gave the investigator for initially lying and eventually telling the truth: that she initially lied because she did not want her mother to be angry and that she eventually told the truth because she wanted to rid herself of guilt. Talley argued that this constituted deficient performance and that it prejudiced him because the jury was left to attempt to reconcile A.D.'s conflicting statements without hearing her reasons for them.
¶3 The postconviction court conducted a Machner hearing[2] more than two years after the trial. There was undisputed testimony that trial counsel had practiced criminal law for thirty-three years and had tried hundreds of cases. Trial counsel testified that he had no specific recollection as to why he did not ask the questions Talley claimed should have been asked. However, with regard to his cross-examination of A.D., trial counsel stated,
I wasn't sure, and this is pure speculation in trying to determine why I didn't want a reason [from A.D.] in there, the only thing that sort of stands out, I was not sure what [A.D.] was going to say and I didn't want to impeach her on that, if I had to.
¶4 An objective view of the record, including trial counsel's testimony at the Machner hearing, supports the conclusion that experienced counsel could reasonably have decided to elicit as much favorable testimony from A.D. as possible and otherwise seek to avoid eliciting answers that might require trial counsel to impeach her.[3] On that basis, we conclude that counsel's performance "was objectively reasonable according to prevailing professional norms."See State v. Kimbrough , 2001 WI App 138, ¶31, 246 Wis. 2d 648, 630 N.W.2d 752. Because Talley has not established that trial counsel's performance was deficient, we affirm the order denying his motion for a new trial.
BACKGROUND
¶5 The conviction Talley challenges on appeal is the conviction for one count of first-degree sexual assault, contrary to WIS. STAT. § 940.225(1)(a) (2017-18),[4] which states that a person is guilty of a Class B felony if he "[h]as sexual contact or sexual intercourse with another person without consent of that person and causes pregnancy or great bodily harm to that person." Id. (emphasis added). Talley's defense at trial was that his sexual contact with A.D. was with her consent. For support, he relied on statements A.D. made prior to trial and at trial recanting her original account to police and asserting that the pregnancy resulted from a consensual sexual relationship.
A.D.'s pretrial accounts of Talley's conduct.
¶6 In A.D.'s pre-trial accounts about the sexual contact with Talley, she first gave a detailed account of sexual assault, then recanted, giving varying accounts in which she had consented to intercourse:
- On April 4, 2015, A.D. told police that she had gotten pregnant in January 2014 when Talley raped her. She told police that Talley had forcibly removed her clothes, pushed her down, and raped her, and that when she asked him to stop he told her to "be still." She also told police he threatened to kill her if she told anyone. She had not told anyone until March 2015. On the day A.D. reported the rape to police, Talley was arrested and taken into custody.
- Three days later, on April 7, 2015, shortly after Talley was released from custody, A.D. returned to police and recanted, stating that the pregnancy resulted from sexual intercourse she had with Talley while he was passed out from taking Xanax, and that he had not awakened during intercourse.[5]
- Three months later, on July 3, 2015, A.D. told the defense investigator that she and Talley had had a consensual sexual relationship that involved repeated intercourse, and that she had lied to police when she said Talley raped her because the truth would have made her mother angry. The investigator's report stated that A.D. said she was telling the truth about the consensual relationship "to rid herself of guilt."
- On September 14, 2015, the morning Talley's jury trial was scheduled to start, A.D. gave a statement to police, stating that the truth was that she and Talley engaged in consensual sex in her bedroom while watching T.V., and that it "just happened."
Trial testimony related to A.D.'s statements.
¶7 The State presented the testimony of A.D., A.D.'s mother, the police officers who took each of A.D.'s statements, and the police officers who arrested and questioned Talley. Talley did not testify or call any witnesses.
¶8 A.D. testified on direct examination that she remembered telling the police that Talley raped her, but she said the September 14, 2015 statement was "the truth[.]" On direct examination she said, "I wasn't raped." Her trial testimony was that she and Talley had had consensual sex on "[l]ike ten" occasions, that they "agreed on it," and that he "did not rape" her.
¶9 This appeal is based on what happened next, when defense counsel cross-examined A.D. Defense counsel asked questions focusing on the statements A.D. had given to her mother, the police, two assistant district attorneys, and the defense investigator recanting the rape allegation and affirming that the sex with Talley had been "consensual," "mutual," and "with [her] permission." Defense counsel asked twice if the "rape story" was just "made up," and each time A.D. answered that it was.
Trial testimony related to Talley's attempts to intimidate witnesses and get A.D. to change her story.
¶10 A.D. testified that she had told police that Talley threatened her after police learned from A.D.'s mother about Talley's sexual contact with A.D. Police had been told of the sexual contact when they responded on the evening of April 3, 2015, when A.D.'s mother flagged them down during a physical altercation she was having with Talley related to A.D.'s allegation that Talley had raped her.[6] Talley was not taken into custody at that point. A.D. testified that she had told police that at 4:46 a.m. on April 4, 2015, before Talley was taken into custody, he called A.D. and said, "Me and my guys are going to be over there in the morning, and we are going to kill y'all."
¶11 The jury also heard audio recordings of calls Talley made to A.D.'s mother after Talley was arrested April 4, 2015, and while he was in custody. He made phone calls in which he told A.D.'s mother to "fix this fucking charge," to prevent DNA testing of the baby by hiding the child and taking a different baby to be swabbed, and to tell the police that she and A.D. were "mad because [Talley] wouldn't pay the light bill, some shit like that, man." He told A.D.'s mother, "Make it make sense, cause that's what I said, they mad cause I wouldn't pay a light bill, make this shit make sense for they can drop this fucking charge, you hear me?"
The conviction, postconviction motion, and the Machner hearing.
¶12 The jury convicted Talley on all counts. Talley moved for postconviction relief, raising claims of ineffective assistance of counsel. As noted above, the postconviction court held a Machner hearing. At the hearing, Talley and Talley's trial counsel testified. Talley's trial counsel testified that he had practiced criminal law for thirty-three years, that he had tried hundreds of cases, and that he had experience trying sexual assault cases involving recanted allegations. Trial counsel testified as follows about his cross-examination of A.D. at trial:
[Postconviction counsel]: Can you think of any reason why you would have chosen not to elicit the testimony at trial from [A.D.] that her original story to police was inaccurate, that she made it up because she didn't want to anger her mother?
[Trial counsel]: ... I do not have any independent recollection why I would not ask for a reason why she's saying that now.
....
[Postconviction counsel]: ... [A.D.] told the investigator that she came forward with the truth, that this was a consensual sexual relationship with Mr. Talley because she wanted to rid herself of guilt; is that accurate?
[Trial counsel]: It's in the report, yes.
[Postconviction counsel]: ... [C]an you think of any reason why you would not have elicited that testimony from [A.D.] when she testified at Mr. Talley's trial?
[Trial counsel]: ... [I]f you want me to speculate, I can. It may have been that I didn't know what was going to come out of her mouth at trial despite what I have in my investigator's report. I wasn't sure, and this is pure speculation in trying to determine why I didn't want a reason in there, the only thing that sort of stands out, I was not sure what [A.D.] was going to say and I didn't want to impeach her on that, if I had to. But that is pure speculation.
¶13 On cross-examination, trial counsel was asked by the State why he would have had "a fear" of what the victim might say on the stand:
[Trial counsel]: Because she had, she was in contact with the district attorney's office, she had previously given a nonconsensual story; and I just, despite-and I had seen her at the Talley house but I just wasn't sure what exactly, despite what she had told our investigator, what version would eventually come out, I don't know, I wasn't sure.
¶14 Talley testified that trial counsel had met with him only twice prior to trial[7] and that trial counsel had told him that if A.D. testified that the sex was consensual, he would not be convicted of the felony charge of sexual assault causing pregnancy.
¶15 The postconviction court held that there was not a reasonable probability that asking A.D. during cross-examination why she had initially lied would have resulted in a different outcome:
Given the totality of the evidence presented to the jury, there is no reasonable probability that the jury's verdict would have been different if A.D. testified that she initially lied so that her mom wouldn't be mad at her. There's no reasonable probability that the jury's verdict would have been different if A.D. testified that she finally told the truth to rid herself of guilt.
It further noted the evidence of repeated attempts to intimidate A.D.:
[T]he totality of evidence presented to the jury[ ] include[ed] the evidence about significant details about nonconsensual sex that A.D. gave the police when she initially reported that the defendant raped her, [and] the evidence about the defendant's intimidation or attempt to interfere with A.D. immediately after sex occurred, and to intimidate or interfere with A.D. and [A.D.'s mother] very soon after police became involved in investigating the matter.
¶16 Because the alleged deficiency did not prejudice Talley, the trial court denied Talley's postconviction motion.[8] This appeal follows.
DISCUSSION
Standard of review and relevant law.
¶17 When we review a claim of ineffective assistance of counsel, we uphold the trial court's factual findings unless they are clearly erroneous. State v. O'Brien , 223 Wis. 2d 303, 324-25, 588 N.W.2d 8 (1999). Whether counsel's assistance was ineffective based on these facts presents a question of law, which we review de novo . Id. To prevail on such a claim, a defendant must establish both deficient performance and prejudice. Strickland v. Washington , 466 U.S. 668, 687 (1984).
¶18 Reviewing courts should be "highly deferential" to counsel's strategic decisions. State v. Carter , 2010 WI 40, ¶22, 324 Wis. 2d 640, 782 N.W.2d 695 (quoting Strickland , 466 U.S. at 689 ). There is a " 'strong presumption' that [counsel's] conduct 'falls within the wide range of reasonable professional assistance.' " Id. (quoting Strickland , 466 U.S. at 689 ). However, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland , 466 U.S. at 689. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. "[S]trategic or tactical decisions must be based upon rationality founded on the facts and the law." State v. Felton , 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983). "If tactical or strategic decisions are made on such a basis, this court will not find that those decisions constitute ineffective assistance of counsel[.]" Id. A court need not address both prongs-deficient performance and prejudice-when a defendant makes an insufficient showing on one. Strickland , 466 U.S. at 697.
¶19 Where trial counsel cannot remember having made a strategic decision, this court is "still required to consider, based on all of the information available to counsel at the time, whether counsel's trial decision was objectively reasonable." State v. Honig , 2016 WI App 10, ¶28, 366 Wis. 2d 681, 874 N.W.2d 589.
Trial counsel's cross-examination of A.D. was objectively reasonable.
¶20 Talley argues that "trial counsel failed to elicit testimony from A.D. favorable to Mr. Talley's defense that he had consensual sex with A.D." He argues that "[h]ad trial counsel asked A.D. why she lied to police, she would have said because she did not want to anger her mother," and "had trial counsel asked A.D. what made her come forward with the truth that the sex was consensual, she would have said to rid herself of guilt."
¶21 Talley's arguments presume that A.D. would have repeated her statements from July 3, 2015, to the jury if he had only given her the opportunity. The testimony of trial counsel, however, was that he did not know "what was going to come out of her mouth at trial[.]" What was known to trial counsel at the time was that the witness had made multiple statements, all inconsistent with each other. In an apparent attempt to exonerate Talley and take responsibility for the pregnancy herself, A.D. had at one point given the Xanax story, which she abandoned before trial, about having sex with Talley while he was passed out. In light of her prior statements, it is not reasonable to assume that A.D. would have answered open-ended questions about why she lied and why she decided to tell the truth in a way that was favorable to Talley.
¶22 Talley further argues that obtaining these answers "would have given the jury reason to believe the truth of her trial testimony." This presumes too much as well. It presumes that if these statements had been elicited, the jury would have found A.D.'s testimony credible. It is not reasonable that these explanations would have changed the jury's determination. For one thing, A.D.'s fear of her mother's anger cuts both ways in this case: it might also explain why she recanted. For another, there was substantial evidence, including Talley's own words on recorded phone calls, that A.D. was under pressure to say what was needed to "fix" the sexual assault charge. In the context of that evidence, and in light of her own testimony that she had lied, A.D.'s testimony would not have been transformed into credible testimony merely by adding that she had lied to avoid angering her mother and had recanted because of guilt.
¶23 Talley's trial counsel's approach to cross-examination of A.D. was "based upon rationality founded on the facts and the law." See Felton , 110 Wis. 2d at 502. It is objectively rational for trial counsel to obtain the testimony most helpful to the defendant and avoid further questioning of an unpredictable witness that might prompt answers requiring counsel to impeach a witness who was otherwise helpful to the defense. In the context of the rest of the evidence, it is an objectively rational decision to minimize the potential of specific damaging evidence against Talley after trial counsel secured from A.D. repeated testimony that the pregnancy resulted from a consensual relationship, that Talley had not raped her, and that she had "made up" the rape allegation.
¶24 For these reasons, we affirm the judgments and the order denying Talley's motion for postconviction relief.
By the Court. -Judgments and order affirmed.
Not recommended for publication in the official reports.

Talley was charged with four counts of intimidation of a witness based on phone calls he made to his wife from jail. He was also charged with misdemeanor battery, disorderly conduct, and sexual intercourse with a child age sixteen or older. He was convicted on all charges. The Honorable M. Joseph Donald presided over the jury trial and entered the judgment of conviction. The Honorable Carolina Stark denied Talley's postconviction motion.

State v. Machner , 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (holding that an evidentiary hearing in which trial counsel testifies is "a prerequisite to a claim of ineffective representation on appeal").

Trial counsel also testified at the postconviction hearing that his goal at trial was "to elicit the best evidence [he] can to protect ... [his client]" and that to do so, he had to decide "what questions to ask and who to ask them and who to put them to and try to keep out bad things. " (Emphasis added.)

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

April 7, 2015 was the day Talley was released from custody, and A.D.'s April 7 account was consistent with Talley's statements upon his arrest and while he was in custody that due to daily drug and alcohol use, he had no memory of sexual contact with A.D.

A.D.'s mother repeatedly testified that she couldn't remember what she had told police and that she couldn't remember Talley threatening her or A.D. When she was asked at trial about specific conversations she had with Talley while he was in custody, she answered that she did not remember the content of the conversations.

Talley had made this same assertion at the trial court on the morning of the jury trial when he asked the trial court to allow his trial counsel to withdraw and adjourn the trial for him to retain new counsel. At that time, trial counsel had provided the trial court with the dates of all of his prior contacts with Talley, which were at least twelve times prior to the week of trial and then "numerous times this week."

Talley argued other grounds for ineffective assistance in his postconviction motion that he has not pursued on appeal. We need not address those.